[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15898

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 21, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-20202-CR-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LEONEL GALDOS, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 21, 2009)**

Before HULL, WILSON and HILL, Circuit Judges.

PER CURIAM:

Leonel Galdos, Jr., appeals his convictions for conspiracy to launder money

and testifying falsely before a grand jury on the grounds that: (1) the district court erred by not holding a competency hearing sua sponte; (2) the district court erred by improperly joining and not severing the charges at trial; (3) the evidence was insufficient to convict him; (4) the district court improperly limited his cross-examination; and (5) the government improperly commented on his failure to present a defense and right to remain silent. Galdos also appeals his 78-month sentences on the grounds that the district court erred by: (1) not considering the 18 U.S.C. § 3553(a) factors and weighing the guidelines too heavily; (2) finding him responsible for a loss amount of more than $400,000; (3) applying a two-level; sophisticated-laundering enhancement; and (4) excluding mitigating evidence. After review and oral argument, we affirm Galdos's convictions and sentences.

## I. BACKGROUND

### A. Indictment and Plea Hearing

A 43-count indictment charged Galdos and nine others (Raul Rodriguez, Armando Araas, Carlos Enrique Monteagudo, Alain Rhaf Vega, Marisol Gonzalez Torres, Edith Balog, William Balladares, Yulen Arderi, and Jannette Morales) with a massive Medicare fraud conspiracy. More specifically, the indictment charged Galdos in only 6 of the 43 counts, as follows: (1) conspiracy to launder

2

money, in violation of 18 U.S.C. § 1956(h) (Count 13); (2) money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(I) and 2 (count 27); (3) conspiracy to engage in a monetary transaction involving criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. § 1956(h) (Count 30); (4) two counts of engaging in a monetary transaction involving criminally derived property of a value greater than $10,000, in violation of 18 U.S.C. §§ 1957 and 2 (Counts 35 and 37); and (5) testifying falsely before a grand jury, in violation of 18 U.S.C. § 1623(a) (Count 43).

Galdos initially indicated that he wanted to plead guilty. The district court held a plea hearing and questioned Galdos to ensure that he understood the nature of the proceedings. Galdos said that he was twenty-seven years old, that he dropped out of school in the 7th grade, and that he never had been treated for any mental illness. The district court asked Galdos if he had received a copy of the indictment, and Galdos said, "I didn't understand that." The district court explained what the indictment was and asked Galdos again if he had seen the document. Galdos said, "No." The district court said it would hold the proceedings in abeyance until Galdos had an opportunity to review the indictment.

Galdos's counsel said he thought Galdos was "confused" because counsel had spent hours with Galdos and his family reviewing the case. The district court

asked counsel what it was supposed to do if Galdos said he has never received a copy of the indictment. Galdos's counsel responded, "I don't think he knows what an indictment is, Your Honor." Counsel further stated, "[T]his has been one of those cases where we struggled to make the language so plain with Mr. Galdos and . . . I know that he's easily confused." The district court responded, "[B]ut the problem is that if he's that easily confused, that sounds like it might be a defense to the case . . . . I'm not going to force somebody to plead guilty when they don't know that they're doing and they claim not to have ever seen the indictment before."

Galdos's counsel added that his office "did the due diligence in having Mr. Galdos forensically looked at" and that Galdos "did very badly . . . on core issues." The district court asked if the government was sure that Galdos had taken the actions he did with criminal intent and commented, "That's the thing that concerns me, is I think he could do all of those things because somebody told him to or asked him to."

After Galdos's counsel said that he had met with Galdos and his family the previous day for two hours, the district court responded, "[Y]ou're not helping your case because what you're telling me is that he's not capable of entering into a plea because he's too stupid to understand what's going on." The district court

4

went into recess and instructed Galdos's counsel to determine whether he would plead or not. When the court resumed, Galdos's counsel stated that Galdos had chosen to proceed to trial.

## B. Trial Evidence

Galdos proceeded to trial alone. Before trial, the government dismissed Counts 27 and 37 against Galdos, leaving four counts–13, 30, 35, and 43–against Galdos. Codefendants Armando Araas and Janette Morales testified against Galdos. The jury found Galdos guilty of Counts 13 and 43 and not guilty of Counts 30 and 35. Accordingly, we summarize the evidence on the two counts of conviction.

By 2003, codefendants Araas and Rodriguez were operating a series of companies established solely to bill Medicare fraudulently. These companies included the fraudulent medical supply stores "NR Medical Services" and "R&J Medical Services" and the fraudulent AIDS clinics "Coral Way Professional Services" and "Sunshine Health Center." These companies were opened under the names of nominee officers, operated for a few months, and then shut down.[1]

---

[1]For example, the Coral Way Professional Services AIDS clinic, which operated from about October 2004 to May 2005, paid individuals $125 to $200 to come to the clinic to have blood drawn. A clinic employee manipulated the blood sample to make it look like the individual suffered from AIDS. The clinic then provided a phony treatment and billed Medicare for AIDS medication at a rate of $6,000 to $10,000 per patient visit. The clinic kept a stock of real medication in a refrigerator in case Medicare officials came for an inspection.

In 2000, Araas became friendly with Galdos. At the time, Araas worked at a pawn shop and met Galdos, who worked at a barber shop, when Galdos came to the pawn shop to pawn jewelry. Araas knew Galdos needed money for bills and to buy a car. In about 2003, Araas asked Galdos if he was interested in making extra money by cashing checks from a "medical supplier store." Galdos said he was interested, but asked whether the checks were "hot funds" because he did not want to "get in trouble." Araas told Galdos that the checks were legitimate and had sufficient funds to be cashed. Galdos agreed to participate.

On June 22, 2004, Araas brought Galdos a check for $2,873.48 to cash. The check was signed by Ramon De Los Santos, the nominee owner of NR Medical Services, and was drawn on a Bank of America account that Araas used to deposit Medicare fraud proceeds. In the memo notation, the check said it was for "displays and design." Araas drove Galdos to a bank where Galdos had an account. Araas told Galdos to show his license to prove his identity and not to tell anyone about the transaction. Galdos cashed the check by himself and gave Araas an envelope with cash when he returned. Araas took the cash and gave Galdos ten percent as his payment for having cashed the check.

Galdos cashed 10 to 12 checks for Araas. For example, on July 8, 2004, Galdos cashed a check for $4,325.75 from NR Medical Services and received a ten

6

percent payment. The memo portion of the check said "ACROCC Designing, Inc." On July 10, 2004, Galdos cashed a check for $2,476.36 from R&J Medical Services at a bank where R&J had its business account. The memo portion of the check said "Designer's Dreams." Araas paid Galdos $250 for cashing it. Galdos also cashed a check for Araas from R&J Medical Services that contained the memo notation "trucking expenses."

After Galdos had cashed several checks for Araas, Araas proposed to Galdos that he open a corporation so that he could make "a little more money." Araas explained that he needed a corporation to "put money through" from an AIDS clinic, that the corporation would be open "for a period of time," and that a maximum of $200,000 would go through the corporation. Araas told Galdos that he would receive $500 for every check that was made payable to the corporation. Galdos asked if the corporation would be "legit" or would "get him into trouble." Araas said that "so far" no one who had opened a corporation for him had gotten into trouble and that if any trouble arose, Galdos should say that his identification had been stolen and that he did not know anything about the corporation. Araas testified that he understood Galdos's concerns to be whether the checks had sufficient funds, not about the source of the funds. Galdos said that he wanted to think about it.

7

Two days later, Galdos called Araas and said that he was "interested in doing the corporation." Araas told Galdos that he would have to obtain a post office box because the corporation needed an address and a post office box would ensure that "nobody would know about it and nobody would interfere." On April 13, 2005, Araas drove Galdos to a Mailboxes, Etc. store. Galdos, with Araas's assistance, signed an application for a post office box in the name of Associate Marketing, the name they had chosen for the corporation. The Mailboxes, Etc. employee requested two forms of identification but Galdos could produce only his Florida driver's license. Araas and Galdos said they would fax a second identification document. They left the store, and Galdos obtained his mother's vehicle insurance card to use as the second identification document.

Araas drove Galdos to Araas's residence to enlist the aid of his wife, who ran a business that assisted people in incorporating companies. Araas's wife applied online to incorporate Associate Marketing. Galdos provided her with his driver's license and his second ID, which she faxed to Mailboxes, Etc. for the post office box. Araas's wife listed Galdos as the registered agent for the corporation and the address for Mailboxes, Etc. as the corporation's address. Araas and Galdos returned to Mailboxes, Etc. and obtained the post office box keys, which Galdos gave to Araas. The next day, Araas' wife received an e-mail from the State

8

of Florida stating that Associate Marketing had been incorporated.

After Associate Marketing was incorporated, Araas gave Galdos several checks payable to the new corporation. Galdos endorsed and deposited these checks for Araas and received a $500 payment for each Associate Marketing check that he cashed. These checks were for amounts as high as $37,650.27 and $35,000. Araas testified that codefendant Rodriguez forged Galdos's signature on checks that were for more than $40,000. Because the Associate Marketing checks were in amounts substantially larger than checks that Galdos previously had been involved with, Galdos asked Araas to pay him more money for cashing them. On some occasions, Araas gave Galdos an additional $200 for cashing the checks.

Associate Marketing, Inc. was one of three or four companies that Araas used to funnel Coral Way's fraudulent proceeds. Galdos recruited his friend Alain Rodriguez, who worked at a grocery store, to cash checks from Araas for "Med Supplies Pharmaceutical, Inc.," another one of Araas's fraudulent companies. Rodriguez testified that Galdos told him that he "had to sign some checks and for signing the checks, [Rodriguez] was going to get some money." Galdos told Rodriguez that he also was cashing checks for Araas and "[n]ot to talk about it" because Galdos "didn't want anybody to know about this." Galdos introduced Rodriguez to Araas in the grocery store parking lot. Galdos was present during

9

their initial meeting. Araas testified that he told Rodriguez that the source of the check funds was "Medicare money from companies."

Araas eventually told Galdos that he would be shutting down Associate Marketing and that there would be no more checks for Galdos. Galdos was disappointed and requested a "couple more" checks "for his company." Araas told Galdos "no" but asked him if he "had a friend or somebody interested in being a president of a company." Araas said that the company was an AIDS clinic, Sunshine Health Center, and that the president "didn't need to do anything" and "just needed to be a president of paperwork." Araas explained that the president would be paid for his "services" the same way that Galdos had been paid with Associate Marketing. Galdos recruited Irving Hernandez for the job.

The trial evidence also recounted the agents' interviews with Galdos and his testimony before the grand jury. On June 8, 2005, Special Agent Julie Rivera of the United States Department of Health and Human Services and FBI Special Agents Huy Nguyen and Avatar LeFevre went to Galdos's residence to interview him. Galdos denied any knowledge of R&J Medical Services or ever receiving any cash or checks from them. Agent Rivera told Galdos that the agents had a check from R&J Medical Services that was made payable to Galdos. Agent Rivera also asked Galdos if he had ever owned or heard of Associate Marketing.

10

Galdos responded that he had not. The agents showed Galdos Associate Marketing's records, but he continued to deny any knowledge of the company. Galdos only volunteered that his driver's license had been stolen. Galdos never mentioned Araas during the interview.

After the interview, Galdos called Araas and was "totally freaking out and screaming," demanding to know what Araas had gotten him into. Galdos told Araas that the agents had asked him about Associate Marketing and that he had denied any knowledge of the company. Araas again told Galdos that he should deny any involvement and say that his identity had been stolen.

On June 10, 2005, FBI Agents Nguyen and Christopher Macrae interviewed Galdos. Agent Macrae asked Galdos if he had opened a post office box for his business. Galdos said that he had never opened a post office box. The agent told Galdos that "people" had identified him as having opened a post office box and that the agents had a copy of his driver's license in connection with the box. Galdos said he had tried to open a post office box "with a friend" but that he had "never actually completed the process." Galdos also stated that his driver's license had been stolen "at around that time" and that "most likely, someone must have used his driver's license to go and open up that mailbox." Galdos also continued to deny any knowledge of Associate Marketing and R&J Medical

11

Services and that he had ever been paid to cash checks or participated in any fraud.

On July 22, 2005, Agents Nguyen, LeFevre, and Lynnette Alvarez-Karnes interviewed Galdos. Galdos continued to deny any association with Associate Marketing or that he had opened a post office box in connection with the company. Agent Alvarez-Karnes asked Galdos if "maybe it was someone else [who] had [him] open the post office box." Initially, Galdos said that "the person [who] had him open the PO box contacted him over the phone." Later, however, Galdos said that he had opened the box because his father had not wanted him to receive mail at his father's residence.

The government also presented evidence at trial of Galdos's grand jury testimony. On December 6, 2005, Galdos appeared before a grand jury and testified under oath. Galdos testified that he had never heard of Associate Marketing, signed any documents in connection with that company, or incorporated that company. Galdos testified that he had opened a post office box in his own name so that he could receive mail "outside of the house" because his mother had been going through his mail. Galdos said that the name on the post office box subsequently had been "changed to the company name." Galdos testified that he was a barber and that he had known Araas as a "client." Galdos stated that he did not know whether Araas had any connection with Coral Way

12

Professional Services or Associate Marketing. Galdos said that Araas had assisted him in opening a post office box and that the two had "shared" the box but that he had not known for what purpose Araas used the box.

On February 8, 2007, Galdos again testified before the grand jury. He was shown two checks from R&J Medical Services that contained his signature and driver's license number. Galdos testified that he had never heard of R&J Medical Services or seen the checks before. Galdos also testified that he had not cashed the checks and that the signatures appearing on the checks were not his. Galdos stated that his license had been "lost" and that "anybody" could have signed his name to the checks.

As noted earlier, the jury found Galdos guilty of Counts 13 and 43 and not guilty of Counts 30 and 35.

## D. Sentencing

The presentence investigation report ("PSI") assigned Galdos a base offense level of 22 based on his responsibility for between $400,000 and $1,000,000 in laundered funds. The PSI applied two-level enhancements for each of these items: (1) being convicted under 18 U.S.C. § 1956, pursuant to U.S.S.G. § 2S1.1(b)(2)(B); (2) engaging in an offense involving sophisticated laundering, pursuant to U.S.S.G. § 2S1.1(b)(3); and (3) obstructing justice, pursuant to

13

U.S.S.G. § 3C1.1. This increased Galdos's offense level to 28. With a criminal history category of I, Galdos's advisory guidelines range was 78 to 97 months' imprisonment.

The PSI recounted Galdos's extensive medical history, including his hospitalization and treatment for a cervical injury when he was four years old and an accidental injury to his abdomen when he was seven years old that required several surgeries and hospitalization. The PSI stated that Galdos underwent psychological counseling following the accident and was diagnosed as a "slow learner." Galdos had a limited ability to read and write and left school in the 8th grade because of his learning problems.

On December 6, 2007, one day before his sentencing hearing, Galdos filed approximately 100 pages of medical documents that contained copies of notes handwritten in Spanish. Before the sentencing hearing, the district court entered an order striking the medical records because they did not comply with (1) a local rule requiring Galdos to identify the purpose of the filing or (2) the requirement in Federal Rule of Criminal Procedure 32(f)(1) that Galdos state his objections to the PSI in writing within 14 days.

At the sentencing hearing, the district court initially notified the parties that it struck the medical records filed by Galdos because they were in Spanish,

without a certified English translation, and were filed the day before sentencing. Galdos stated that the records were filed late because his father went to Cuba at the last minute to obtain them. The district court did not think that anything was added by the records because there was no dispute that Galdos was injured at various times when he was young. The government did not dispute Galdos's injuries. Galdos contended that the records were relevant because they addressed "issues of sophistication with a person who actually has a very low grade of education, who has sustained concussions." The district court noted that the evidence already showed that "people that talked to [Galdos] thought that he was perhaps not the brightest bulb in the store, but not, you know – he was not retarded, he was not incapable of carrying on conversations. He understood what was going on; he participated with them in matters." Furthermore, the district court stated, "I don't know that [Galdos] is the brightest person that's ever appeared in this courtroom, but . . . he is far from the slowest person that's ever appeared."

The district court overruled Galdos's objection to the sophisticated-laundering enhancement because he was involved in the creation of a shell corporation and adopted the PSI's advisory guidelines range. Galdos requested a lenient sentence and, in trying to explain the confusion at his change-of-plea

hearing, noted his low cognitive ability. The district court stated that "it is my intention to sentence him at the low end of the Guidelines range. . . . [U]nless you give me some really good reason, [I will] not go below the Guidelines." The district court sentenced Galdos to concurrent terms of 78 and 60 months' imprisonment on Counts 13 and 43, respectively, and a total of three years' supervised release. The district court stated that it had "considered the statements of all the parties, the presentence report, which contains the advisory Guidelines, and the statutory factors." Galdos appealed.

## II. CONVICTION ISSUES

Galdos raises five challenges to his convictions, but they all lack merit.

### A.    Failure to Hold a Competency Hearing

Galdos argues that the district court erred in failing to order <u>sua sponte</u> a competency hearing. Although we generally review a denial of a competency hearing for an abuse of discretion, <u>United States v. Nickels</u>, 324 F.3d 1250, 1251 (11th Cir. 2003), our review here is only for plain error because Galdos raises the competency issue for the first time on appeal, <u>see</u> <u>United States v. Khoury</u>, 901 F.2d 948, 966 (11th Cir. 1990). Under the plain error standard, this Court will correct an error only if there is: (1) error; (2) that is plain or obvious; (3) that affects the defendant's substantial rights; and (4) that seriously affects the fairness,

16

integrity, or public reputation of a judicial proceeding. United States v. Williams, 469 F.3d 963, 966 (11th Cir. 2006).

A district court shall grant a motion for a competency hearing or order a hearing sua sponte "if there is reasonable cause to believe that a defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a). A trial court must conduct a competency hearing sua sponte when it has a bona fide doubt regarding the defendant's competence. Tiller v. Esposito, 911 F.2d 575, 576 (11th Cir. 1990).

The district court did not plainly err by not ordering a competency hearing sua sponte. The district court had the opportunity to observe and interact with Galdos during the plea hearing and trial. Galdos's behavior did not demonstrate reasonable cause for the district court to believe that he suffered from a mental defect or disease that rendered him mentally incompetent. To the contrary, Galdos demonstrated his comprehension of the proceedings when he was questioned regarding his decision not to testify. In response to questions from his counsel, Galdos said that he understood he had a right to testify, that he was consulted regarding the decision not to testify, that he understood he was waiving that right,

and that he agreed with the advice of counsel. In addition, the district court engaged in a colloquy with Galdos regarding his decision not to testify. In response to the district court's questions, Galdos said that he understood that he had the right to choose whether to testify, that he had discussed the matter with his lawyers, that his lawyers advised him of the pros and cons of testifying, and that he understood that the government could cross-examine him if he testified. These colloquies show that there was not reasonable cause for the district court to believe that Galdos was mentally incompetent.

Galdos points only to the plea hearing proceedings as evidence that the district court had reasonable cause to believe he was not mentally competent. As discussed above, Galdos stated that he had not seen the indictment, even though his counsel said that he had reviewed the charges extensively with Galdos and his family. Galdos's counsel also told the district court that Galdos was "easily confused" and that he had not performed well in an forensic examination.

While the record may suggest that Galdos was of low intelligence, it does not present reasonable cause to believe he was mentally incompetent. The district court reflected this sentiment at sentencing after observing Galdos and listening to the testimony about him. The district court observed that people thought Galdos "was perhaps not the brightest bulb in the store" but "he was not retarded, he was

not incapable of carrying on conversations. He understood what was going on; he participated with them in matters." The district court also observed that Galdos was not "the brightest person that's ever appeared in this courtroom, but . . . he is far from the slowest person that's ever appeared." The fact that Galdos's own counsel never moved for a competency hearing after interacting extensively with Galdos and seeing his performance in the forensic examination confirms the district court's assessment of Galdos. In light of this record, we cannot say that the district court plainly erred by not sua sponte ordering a competency hearing.

**B.    Severance of Charges**

Galdos argues that the district court improperly joined the money laundering and false testimony charges and should have severed the charges for trial. Because Galdos did not move for a severance of the charges in the district court and raises the severance issue for the first time on appeal, we review this issue only for plain error. See Khoury, 901 F.2d at 966.

To determine whether charges were properly tried jointly, this Court conducts a two-step inquiry. United States v. Walser, 3 F.3d 380, 385 (11th Cir. 1993). First, the Court determines whether the initial joinder of offenses was proper under Federal Rule of Criminal Procedure 8(a). Id. Rule 8(a) allows for joinder of offenses "if the offenses charged . . . are of the same or similar

19

character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). If the joinder was proper, the Court then determines whether the district court's failure to sever the charges resulted in "compelling prejudice against which the district court could offer no protection." Walser, 3 F.3d at 385. This inquiry requires an assessment of "whether under all the circumstances of a particular case it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own acts, statements, and conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict." Id. at 386-87.

Galdos has not shown that the district court plainly erred in trying the charges together. First, the charges were joined properly under Rule 8(a) because they constituted parts of a common scheme or plan of: (1) defrauding Medicare; (2) laundering the fraudulent proceeds; and (3) obstructing the law enforcement investigation of the fraud and money laundering offenses. This common scheme was shown by the evidence at trial that: (1) Araas instructed Galdos when they first discussed creating Associate Marketing that Galdos should deny any knowledge of the company and say that his identification had been stolen if any trouble arose; (2) Galdos followed Araas's instructions during his interviews with

20

FBI agents and testimony before the grand jury; and (3) Araas repeated these instructions to Galdos on the phone after Galdos's first interview with the FBI agents. Thus, the charge of testifying falsely before the grand jury was directly connected to the money laundering conspiracy.

Second, the joinder of the charges did not result in compelling prejudice to Galdos. The district court instructed the jury that a separate crime had been charged in each count of the indictment, that each charge and the evidence pertaining to it should be considered separately, and that the fact that the jury may find the defendant guilty or not guilty as to one charge should not affect its verdict as to any other charge. The fact that the jury found Galdos not guilty of some counts demonstrates that the jury instructions offered sufficient protection against prejudice and that the jury considered each count separately. See United States v. York, 428 F.3d 1325, 1334 (11th Cir. 2005). Thus, Galdos has failed to show that the district court plainly erred by joining these charges and by not sua sponte ordering that they be severed for trial.[2]

## C.     Sufficiency of the Evidence

[2]We reject Galdos's argument that he suffered compelling prejudice in the money laundering counts by the admission of his grand jury testimony. First, Galdos was charged with falsely testifying before the grand jury, so the evidence obviously was relevant and admissible. Second, Galdos voluntarily testified before the grand jury, so it cannot be said that the use of this testimony was against his will. Finally, it is unclear how Galdos would have cross-examined himself.

Galdos challenges the sufficiency of the evidence to support his convictions for conspiracy to launder money and testifying falsely before the grand jury. We conclude that the evidence was sufficient to support both convictions.[3]

To convict a defendant of a money laundering conspiracy, the government must prove that (1) an agreement existed between two or more persons to violate 18 U.S.C. § 1956 and (2) the defendant knowingly and voluntarily participated in the agreement. United States v. Edwards, 526 F.3d 747, 756 n.26 (11th Cir. 2008). To prove the underlying charged § 1956 violation, the government was required to show that Galdos (1) knowingly conducted a financial transaction, (2) which he knew involved funds that were the proceeds of some form of unlawful activity, (3) where the funds involved in the financial transaction in fact were the proceeds of a specified unlawful activity, and (4) the defendant engaged in the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity. United States v. Tarkoff, 242 F.3d 991, 994 (11th Cir. 2001).

Galdos argues that the government failed to prove that he knew that he was

---

[3]We review the sufficiency of the evidence de novo, recounting the evidence in the light most favorable to the government and accepting all reasonable inferences in favor of the verdict. United States v. Klopf, 423 F.3d 1228, 1236 (11th Cir. 2005).

laundering proceeds from an illegal health care fraud scheme. As an initial matter, the government was required to prove only that Galdos knew that the funds involved represented the proceeds of unlawful activity. United States v. Martinelli, 454 F.3d 1300, 1312 n.8 (11th Cir. 2006). The following evidence, viewed in the light most favorable to the jury's verdict, supported a reasonable inference that Galdos knew that the funds were from some form of illegal activities: (1) Galdos knew the occupations of the parties involved and that none of them had any experience in running companies, let alone health care companies; (2) Galdos knew that the checks he cashed contained phony notations for services he had not provided; (3) Galdos had been instructed, and he, in turn, instructed others to keep the financial transactions secret; (4) Galdos used a post office box as the address for Associate Marketing to ensure that the company's operations were secret and that no one interfered with them; and (5) Galdos lied repeatedly about his association with the shell companies and the fact that he had cashed checks. Although Galdos emphasizes the evidence that Araas led him to believe that the checks were legitimate and that Galdos had asked about the tax consequences of the money, the jury was free to weigh this evidence against the contrary evidence detailed above and reach its own conclusion as to Galdos's knowledge of the illegal nature of the money involved.

23

As to the charge of testifying falsely before the grand jury in violation of 18 U.S.C. § 1623(a), the government was required to show that Galdos (1) knowingly made (2) a false (3) material declaration (4) under oath. United States v. Cross, 638 F.2d 1375, 1378 (5th Cir. 1981).[4]

Galdos challenges only that the evidence was insufficient to show that he knowingly made a false statement because of his "limited mental capacities" and that he did not willfully lie. As an initial matter, § 1623(a) does not require that the government prove that Galdos lied willfully. Furthermore, the evidence was sufficient to prove that Galdos knowingly made false statements to the grand jury and that his statements were not the result of mistake, inadvertence, or lack of memory. The evidence demonstrated that Galdos denied cashing checks for Araas's companies or incorporating Associate Marketing, even though the overwhelming evidence in the case showed that Galdos did. Galdos continued to deny any involvement or knowledge of the checks or the company, even after being shown evidence of his signatures on checks and other documents. Galdos claimed that his identity had been stolen, which was the lie that Araas had told him to tell if he was questioned about the transactions. This evidence was sufficient

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

for the jury to conclude that Galdos knowingly made materially false statements to the grand jury.

**D.      Limitation of Cross-Examination**

Galdos contends that the district court abused its discretion and violated his Sixth Amendment confrontation rights by limiting his cross-examination of codefendant Jannette Morales about her plea agreement.[5]  Morales was charged in Count 21, along with Araas and Raul Rodriguez, with money laundering based on a check that she cashed for Coral Way Professional Services.  Morales pled guilty to Count 21 and was sentenced to 18 months' imprisonment.  Morales testified that she had worked as a medical assistant at Coral Way and later at Sunshine Health Center.  On direct examination, Morales testified that she had manipulated patients' blood, created false patient records, cashed fraudulent checks, and lied to law enforcement officers.  Before cross-examination, Galdos's counsel requested that the district court allow him to cross-examine Morales concerning a money laundering count "that she was originally charged with" along with Galdos.  The district court refused counsel's request.

On appeal, Galdos argues that the district court improperly refused to allow

---

[5]We review a district court's decision to limit cross-examination for an abuse of discretion. United States v. Baptista-Rodriguez, 17 F.3d 1354, 1371 (11th Cir. 1994).

him to cross-examine Morales about the counts that were dismissed as part of her plea bargain. However, there were no counts dismissed as part of Morales's plea bargain. Morales pled guilty to the only charge in the indictment against her.

Galdos's counsel otherwise was permitted to cross-examine Morales and questioned her extensively regarding her involvement in the health care fraud and the truthfulness of her statements to law enforcement officers. Thus, Galdos's counsel was able to portray Morales as biased in favor of the government because she had received a substantial benefit by not being prosecuting for all the crimes that she may have committed. Accordingly, the district court did not abuse its discretion in limiting Galdos's cross-examination of Morales or deny his constitutional right to confront her.

## E.     Government Comment on Failure to Present a Defense

Galdos argues, for the first time on appeal, that the government's questions and the testimony it solicited improperly commented on his failure to present a defense and right to remain silent. Because he did not raise this specific argument below, we review this issue only for plain error. Khoury, 901 F.2d at 966.

First, Galdos argues that a series of questions by the government to Agent Alvarez-Karnes about her interview with Galdos were an improper comment on Galdos's failure to provide a defense. The government asked Agent Alvarez-

Karnes, "During this interview [with Galdos], did you give [him] an opportunity to explain to you that someone else may have asked him to open up this [post office box]?" Galdos's counsel objected to the question only on the basis that its form was "confusing." The district court overruled the objection, and the agent responded, "Yes." Next, the government asked Agent Alvarez-Karnes, "And did you also give [Galdos] an opportunity to explain to you that someone else may have asked him to open up this corporation?" The Agent replied, "Yes." Galdos's counsel did not object to the question. Finally, the government prosecutor asked Agent Alvarez-Karnes, "And did you pose questions to [Galdos] during this interview that would have allowed him to provide those explanations?" Again, Galdos's counsel did not object, and the agent replied, "Yes."

We reject Galdos's argument that the government's questions to Agent Alvarez-Karnes shifted the burden of proof or implicated Galdos's right to remain silent. Agent Alvarez-Karnes explained that Galdos initially denied any knowledge or involvement in the charged conspiracy, so the Agents shifted their line of questioning to ask if someone else, i.e., Araas, had directed Galdos to create Associate Marketing or open the post office box. Agent Alvarez-Karnes further testified that Galdos admitted that he had opened a post office box, albeit for personal reasons, and did not mention Araas. We reject Galdos's argument

27

that the jury could have understood these questions as either comments on Galdos' right to remain silent or as burden-shifting comments. In any event, the district court instructed the jury that the government had the burden of proving the defendant guilty, that the defendant was not required to prove his innocence or to produce any evidence at all, and that the defendant's election not to testify could not be considered in any way during the jury's deliberations.

Galdos also objects that testimony solicited by the government from FBI Agent Macrae about his interview with Galdos violated his right to remain silent. The government asked Agent Macrae, "Could you describe for the jury what you observed of the defendant's behavior during your interview?" Galdos's counsel objected on the ground that Galdos's "behavior" was not at issue. The district court overruled the objection as premature. The agent replied, "Mr. Galdos was extremely nervous during the interview. He was continually fidgeting. He could not keep his story straight. And we pressed him and showed him more evidence that showed that he was not being truthful with us during our interview, he continued to attempt to try to change his story." Galdos's counsel moved to strike the answer on the grounds that it was "unresponsive to the question" and that the agent's lack of familiarity with Galdos provided no "foundation" for an opinion about his nervousness. The district court overruled the objection on both grounds.

28

While Agent Macrae's comment that Galdos "was not being truthful" was perhaps improper to the extent it interfered with the jury's province to make credibility determinations, it did not implicate either the burden of proof or Galdos's right to remain silent. Agent Macrae's testimony intended to demonstrate that Galdos's nervous demeanor showed he had guilty knowledge of the post office box and the shell corporations involved in this case and thus was relevant to prove Galdos's guilt. Thus, Galdos has failed to show plain error in either regard.

## III. SENTENCING ISSUES

Galdos also raises four challenges to his sentence. None has merit.

## A.    Consideration of § 3553(a) Factors and Weight to the Guidelines

We reject Galdos's argument that the district court imposed a procedurally unreasonable sentence by not considering the 18 U.S.C. § 3553(a) factors.[6] The district court explicitly stated that it had considered the "statutory factors." The district court is not required to discuss each § 3553(a) factor, United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005), and its statement that it considered the § 3553(a) factors was sufficient, see United States v. Amedeo, 487 F.3d 823, 833

---

[6]We review a sentence for procedural or substantive reasonableness under an abuse-of-discretion standard. Gall v. United States, 552 U.S. ___, ___, 128 S. Ct. 586, 597 (2007); United States v. Ellisor, 522 F.3d 1255, 1273 n.25 (11th Cir. 2008).

(11th Cir.), cert. denied, 128 S.Ct. 671 (2007).

We also reject Galdos's argument that the district court procedurally erred by placing undue weight on the guidelines. Galdos specifically points to the district court's statement that it intended to sentence Galdos at the low end of the guidelines range unless Galdos's counsel gave him a "really good reason" to do otherwise. The district court made this statement after Galdos's counsel had made his plea for leniency in sentencing. The context of the statement shows that the district court had considered the § 3553(a) factors, determined that a sentence at the bottom of the advisory guidelines range was reasonable, and had not heard anything from Galdos's counsel to convince it to sentence Galdos differently. Thus, we find no procedural error in the district court's sentence in this regard.

## B.    Amount of Loss

We also conclude that the district court did not plainly err in calculating Galdos's base offense level based on a finding that Galdos was responsible for over $400,000 in laundered money. Galdos failed to object to and, thus, admitted the facts in the PSI that: (1) Galdos established Associate Marketing at the direction of Araas; (2) he was the registered owner of Associate Marketing; (3) he lied when he denied signing checks and negotiating checks totaling $4,976.36 for R&J Medical Services; (4) he recruited two friends to serve as nominal owners of

30

Sunshine Health Center and Med Supplies Pharmaceutical; (5) $330,888.99 was laundered through Associate Marketing and $133,620.26 was laundered through Med Supplies Pharmaceutical; and (6) he was responsible for $469,485.61 in laundered funds. See United States v. Bennett, 472 F.3d 825, 833-34 (11th Cir. 2006).

Galdos does not contest the amount of loss figure but argues that the total amount is not attributable to him as relevant conduct. A defendant may be held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). To be held responsible for the conduct of others, the conduct must be both (1) "in furtherance of the jointly undertaken criminal activity" and (2) "reasonably foreseeable in connection with that criminal activity." Id. § 1B1.3 cmt. n.2; United States v. Hunter, 323 F.3d 1314, 1319 (11th Cir. 2003). When determining the loss amount attributable to a particular defendant convicted of a conspiracy offense, the district court must "first determine the scope of criminal activity the defendant agreed to jointly undertake, and then consider all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity." United States v. McCrimmon, 362 F.3d 725, 731 (11th Cir. 2004) (quotations marks omitted).

Galdos has not shown that the district court plainly erred in attributing to him a loss amount of over $400,000. Galdos initially cashed several checks for Araas that were fraudulently obtained Medicare proceeds in exchange for payment of a percentage of the check. Galdos then agreed to incorporate the shell corporation Associate Marketing and be its registered agent. As the nominee owner of Associate Marketing, Galdos deposited checks of increasingly larger amounts for Araas into Associate Marketing's accounts. Although Araas testified that Raul Rodriguez forged Galdos's signature on some of the Associate Marketing checks, those actions were reasonably foreseeable to Galdos as part of the jointly undertaken criminal activity to which he had agreed as the owner of the shell corporation.

Furthermore, Galdos recruited his friend Alain Rodriguez for Araas to be the nominee owner of another fraudulent company called Med Supplies Pharmaceutical, Inc. Galdos explained to Rodriguez what the position would entail and that he should not talk about it. Galdos also was present when Araas explained to Rodriguez how he would need to sign and cash checks for him.

In light of this evidence, the district court did not plainly err in attributing the full amount of loss caused by Associate Marketing and Med Supplies Pharmaceutical to Galdos as relevant conduct.

32

## C. Sophisticated Laundering Enhancement

Section 2S1.1(b)(3) of the Guidelines provides for a two-level enhancement if an offense involved "sophisticated laundering." U.S.S.G. § 2S1.1(b)(3). The guidelines commentary explains that "'sophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. § 1956 offense" and that it typically involves the use of "fictitious entities," "shell corporations," "two or more levels (i.e., layering) of transactions," or "offshore financial accounts." U.S.S.G. § 2S1.1 cmt. n.5(A).

The district court did not clearly err in applying a two-level sophisticated-laundering enhancement.[7] The evidence showed that Galdos created a shell corporation, Associate Marketing, that was used as a depository for funds that were fraudulently obtained from Medicare through Araas's clinics. Galdos's conduct also involved multiple levels of transactions, as checks were written to him from the clinics with notations of phony services allegedly provided by Associate Marketing and he then deposited them into Associate Marketing's bank accounts. Despite Galdos's alleged lack of intelligence, he participated in offense conduct that was quite sophisticated. Thus, the district court did not clearly err in

---

[7]We review the district court's factual findings for clear error and its interpretation of the sentencing guidelines de novo. United States v. Moore, 443 F.3d 790, 793 (11th Cir. 2006).

applying the two-level sophisticated-laundering enhancement.

## D.    Striking of Medical Records

The district court did not err in refusing to consider the medical records submitted by Galdos.[8]  Galdos does not dispute the district court's finding that his medical-records filing violated the local rule requiring him to identify the purpose of the filing.  Furthermore, the PSI contained Galdos's medical history, and his past medical problems were not disputed by the government.  Galdos says that the medical records showed his "limited mental capabilities," but does not say that they state anything beyond what was listed in the PSI.  Thus, we find no reversible error in this regard.

**AFFIRMED.**

---

[8]A district court's factual finding that a party violated a local rule is reviewed for clear error.  United States v. Venske, 296 F.3d 1284, 1291 (11th Cir. 2002).  This Court "gives great deference to a district court's interpretation of its local rules."  Clark v. Housing Auth. of City of Alma, 971 F.2d 723, 727 (11th Cir. 1992).