**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Virginia Nell WALSER, Defendant–**
**Appellant.**

**No. 92–6496.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 30, 1993.

John W. Kelly, III, Selma, AL, for defendant-appellant.

Donna Barrow, U.S. Attorney's Office, Mobile, AL, for plaintiff-appellee.

Before FAY and DUBINA, Circuit Judges, and GIBSON *, Senior Circuit Judge.

DUBINA, Circuit Judge:

This appeal presents a novel question: can one who intentionally causes an innocent party to commit perjury unwittingly be held liable as a principal under 18 U.S.C. § 2? This question arises from Virginia Nell Walser's ("Walser") appeal from her convictions for perjury and aiding and abetting, in violation of 18 U.S.C. §§ 1623 and 2(b), and making false and fraudulent statements to a government agency or department, in violation of 18 U.S.C. § 1001. For the reasons that follow, we affirm.

## I. FACTS

Walser and her husband farmed in Marion, Alabama. In 1989 a federal grand jury indicted them for defrauding the Federal Crop Insurance Corporation ("FCIC") and the

---

* Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

Southern Crop Insurance Corporation ("SCIC") by submitting fraudulent crop insurance claims.[1] The government had alleged that the Walsers failed to report all the soybeans they produced on acreage insured by the SCIC. Specifically, the government claimed that Walser and her husband surreptitiously grew approximately 4,980 bushels of insured soybeans and sold them under another name. Thus, the government contended, the Walsers were overpaid on their subsequent crop loss claims because they grew and sold more soybeans than were reported to the SCIC.

At trial, the Walsers defended by claiming that those 4,980 bushels of soybeans were an uninsured crop derived from another farm. They contended that Walser notified the SCIC of these uninsured beans through a document known as an SCI–013 form, entitled Statement of Facts ("SCI–013"). The SCI–013 is a standard form used for all correspondence with the SCIC.

Walser called Richmond Morrow ("Morrow"), an FCIC claims specialist, as a defense witness. Pursuant to a subpoena, Morrow brought certain documents from his file to the trial. Two were admitted into evidence. The first was a letter dated July 14, 1986, from Walser to Morrow at the FCIC. It stated as follows:

Dear Mr. Morrow,

I am sending you a copy of the SCI–013 Statement of Facts that I have attached to my 1986 acreage report.[2] My crop insurance is with reinsurance, but due to the confussion [sic] in 1985 soybean production I wanted a copy of this statement, that was attached to my acreage report, on record with you in your office.

Sincerely,
/s/Virginia N. Walser

The second document was the SCI–013 form referred to in Walser's letter. Entitled "Southern Crop Insurance Agency, Incorpo-

rated, Statement of Facts" and also dated July 14, 1986, it stated as follows:

I have broadcast approximately 300 acres of soybeans on the Bob Rees place, ASCS farm number 024. These soybeans will not be covered by crop insurance. So there will not be a confussion [sic] or mix up between the production of soybeans covered by crop insurance and the production on farm 024, I am attaching a copy of this statement to my acreage report.

The SCI–013 form sent to Morrow thus purported to show that the 4,980 bushels of soybeans at issue were not insured beans harvested from Walser's farm, but were uninsured beans planted on a farm owned by a man named Bob Rees.

A jury acquitted Walser and her husband of all charges.

After the trial, special agent William Doles ("Agent Doles") of the Office of the Inspector General ("OIG"), United States Department of Agriculture ("USDA"), examined the SCI–013 form. He noticed that the name of the printer, AAA Printing & Graphics ("AAA"), appeared at the bottom of the form. Agent Doles contacted AAA and learned that AAA did not print and deliver the SCI–013 form to the SCIC until July 22, 1986, one week *after* the July 14, 1986 date used by Walser on the form sent to Morrow. It thus appeared that Walser prepared and back-dated a false document.

A second federal grand jury returned a three-count indictment against Walser based on this and other evidence of alleged false statements. Count I charged Walser with perjury and aiding and abetting by knowingly and willfully causing Morrow to present false evidence under oath, in violation of 18 U.S.C. §§ 1623 and 2(b). Counts II and III charged Walser with willfully and knowingly making and causing to be made false, fictitious and fraudulent statements and representations of material fact to the Agriculture Stabilization Conservation Service ("ASCS"),

---

1. The FCIC is an agency of the United States Department of Agriculture that provides crop insurance to farmers. Farmers pay premiums and, if a loss is suffered, collect from the premium pool. The SCIC is a private company that sells and services crop insurance for the FCIC.

2. An acreage report is part of a farmer's crop insurance policy. Farmers are required to notify the crop insurance company by a certain date how many acres have been planted and whether those acres represent insured or uninsured crops.

an agency of the USDA, in violation of 18 U.S.C. § 1001.[3] These counts stemmed from two 1989 disaster claims in which Walser provided false testimony and documentary evidence purporting to show that she purchased certain fruit and vegetable seeds, when in fact she had not.

Prior to her second trial, conducted in 1992, Walser moved for severance of Count I from Counts II and III. The district court denied the motion. Walser renewed her severance motion at trial, which the district court again denied. Walser also moved for a judgment of acquittal at the close of the government's case and renewed the motion at the close of the defense's case. The district court denied the motions. A jury found Walser guilty on all counts. The district court sentenced her to concurrent terms of twenty-seven months imprisonment, followed by a three-year term of supervised release. This appeal followed.

### A. Evidence as to Count I

At the 1992 trial Agent Doles testified that he examined all official FCIC and SCIC files pertaining to Walser before her first trial and found no mention of the uninsured soybeans purportedly planted on Bob Rees' farm. (R.II–57.) He further examined Walser's 1986 soybean acreage reports and, contrary to Walser's statement in her letter to Morrow, found no copy of the SCI–013 attached to them. (R.II–67–68). Those acreage reports were dated July 14, 1986, the same date used by Walser when she created the SCI–013 form and the accompanying letter. Each acreage report was marked on the reverse side: "Received July 28, 1986." (R.II–66–67.) The SCI–013 form retrieved from Morrow's files had no date stamp. Agent Doles testified that he did not examine Morrow's files because Morrow, as an FCIC official, was not authorized to maintain official SCIC files. (R.II–58–59.) In sum, Agent Doles testified that neither Walser's 1986 acreage reports nor any other document

in the FCIC or SCIC official files indicated that Walser informed the SCIC of uninsured soybeans.

Morrow testified that Walser sent him the SCI–013 and the accompanying letter, although he could not recall when he received them. (R.II–102.) He noted that it was unusual for him to have SCIC documents because he worked for the federal government and the SCIC was a private organization. (R.II–101, 104–05.) He kept the documents, however, because he routinely filed all correspondence. (R.II–103.) He further testified that after Walser subpoenaed the documents in his file she called Morrow to ensure he possessed the subpoenaed documents. (R.II–100.) Morrow told her that he did. Walser then explained that Morrow need not give the OIG a copy of the SCI–013 because it had one already. (*Id.*) Morrow testified that he felt tricked by Walser because he now knew the SCI–013 Walser sent him to be false and back-dated. (R.II–106–07.)

Robert Hagan ("Hagan"), the owner of AAA, testified that the SCIC ordered 5,000 SCI–013 Statement of Fact forms on July 10, 1986. (R.III–132–33.) Prior to this order, another printing company printed the forms. (R.III–143–44, 147.) The old forms did not identify the printer. (R.III–147.) AAA delivered the first 500 forms on July 22 and the remainder on July 28. (R.III–133.) No AAA forms were printed or delivered prior to July 14, 1986. (R.III–134.)

### B. Evidence as to Counts II and III

In 1989 Walser applied for farm disaster relief pursuant to a program whereby the ASCS compensated farmers who could prove, *inter alia*, an inability to plant an intended crop because of bad weather or other forces beyond their control. These claims were referred to as "prevented planting" claims. Walser's claims asserted the prevented planting of sweet corn, watermelon and canta-

---

**3.** Section 1001 of Title 18 states as follows:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false,

fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

loupe. The ASCS county committee reviewing her claims denied relief for lack of documentary support. The committee, however, gave Walser another chance to present evidence to support her claims. At the committee's next meeting, Walser submitted photocopies of several documents purporting to prove her intent to plant sweet corn, watermelon and cantaloupe. These documents included: (1) a cash receipt from Kwik Way Foods ("Kwik Way") for corn and cantaloupe seed, (2) a second Kwik Way receipt for cantaloupe seed, and (3) an invoice from Gold Kist Inc. ("Gold Kist") for the purchase of watermelon seed, sweet corn seed and fertilizer. Walser told the committee she purchased the seeds for planting in 1989, but poor weather prevented her from planting them. (R.III–175.)

After the meeting the committee deliberated. It found the Gold Kist receipt suspicious because it was handwritten. Moreover, William Neighbors ("Neighbors"), an ASCS employee in Marion, Alabama, informed the committee of a recent conversation he had with Walser during which she mentioned that she had not purchased seeds for sweet corn, watermelons or cantaloupe. (R.III–170, 198.) The committee withheld their decision until the Gold Kist invoice could be verified. Subsequently, Gold Kist's manager informed the committee that the questioned invoice was "an invalid ticket." The committee then recommended to the state committee that all payments to Walser be denied for 1989.

At trial, Mary Faith Wheeler ("Wheeler"), Gold Kist's operations manager, testified that Walser met with her sometime before Thanksgiving in 1989 and asked for a falsified invoice. (R.III–216–17.) Walser stated that she needed the invoice for an ASCS meeting the next morning. (Id.) Wheeler at first refused, but then agreed to Walser's request. (R.II–217–18). Wheeler then handwrote a false invoice for the purchase of watermelon seed, corn seed and fertilizer per Walser's specific instructions. (R.III–218–19.) Wheeler handwrote the invoice because Gold Kist's computer-generated invoices would have indicated the correct date and Walser's invoice needed to be back-dated to the previous spring. (R.III–219.) They se-

lected March 22, 1989. (R.III–219–20.) Wheeler wrote "charge" on the invoice, signifying that Walser received the goods and that they were charged to her account. (R.III–220–221.)

Wheeler also testified that Walser wanted an invoice for cantaloupe seed. (R.III–222.) When told that Gold Kist did not sell cantaloupe seed, Walser allegedly stated that she could "get Kwik Way to write her a bill on it." (Id.)

Gold Kist's one-page invoice forms contained three duplicate pages in differing colors. Walser told Wheeler to put the invoice's pink copy in Gold Kist's patron file as proof of the transaction. Walser kept the remaining three copies. Ordinarily, the form's yellow copy, marked "Accounting Copy," was sent to the Atlanta office; the gold copy stayed in Gold Kist's warehouse; the white copy went to the customer. The document submitted to the county committee was a photocopy of the yellow copy, and was clearly marked "Accounting Copy." Wheeler testified that there would be no reason for a legitimate customer to possess the yellow "Accounting Copy" invoice. (R.III–223).

The evidence presented at trial demonstrated that Walser made a second ASCS claim for the prevented planting of purple hull peas .in 1989. To support that claim Walser submitted a photocopy of an invoice from The Wax Company, a wholesale seed distributor. The invoice indicated that her husband purchased 450 pounds of purple hull pea seed on March 18, 1989. At trial, Wally Barnard ("Barnard"), The Wax Company's records custodian, produced the original invoice. It differed from the photocopy submitted to the county committee in at least three ways. First, the original invoice listed Magnolia Aviation as the purchaser; the photocopy listed Walser's husband. (R.III–251.) Second, the original invoice listed the purchase date as July 18, 1989; the photocopy's purchase date was changed to March 18, 1989. (Id.) Last, the original invoice's order date was July 17, 1989; the photocopy listed that date as March 17, 1989. (R.III–251–52.) Barnard testified that he did not make any of these changes. (Id.)

Ferrel Shiver ("Shiver"), a forensic document examiner with the United States Army Criminal Investigation Laboratory, testified that he examined the original and photocopied Wax Company invoices. He concluded that the photocopied invoice submitted by Walser was altered to change the purchaser's name, the order date, and the date of sale. Shiver noted that the original invoice had been printed on a dot matrix printer; the three alterations were made with a full character printer, such as a typewriter. (R.III–268.) Shiver concluded that the original entries had been covered with an opaquing fluid, commonly known as White–Out, then typed over. (R.III–269.)

Walser testified as to Count III only. She stated that she had indeed altered the invoice, but only to correct what she thought were errors on it. (R.III–340.) When asked on cross-examination why she had not contacted The Wax Company to inform them of the purported errors and obtain a corrected copy, she stated that "at the time, it didn't really mean anything." (R.III–335.)

## II.  ANALYSIS

Walser raises three issues on appeal. First, she argues that there was an improper or prejudicial joinder of offenses in the indictment and, thus, the district court erred by denying her motion to sever Count I from Counts II and III of the indictment. Second, Walser asserts that a conviction under 18 U.S.C. § 1623 for perjury cannot be obtained by applying the aiding and abetting provisions of 18 U.S.C. § 2. Last, Walser claims that the district court erred by denying her motions for judgment of acquittal.

### A.  *Joinder*

■  Walser argues that the district court erred by failing to sever the perjury and aiding and abetting (Count I) from the counts alleging false and fraudulent statements made to a government agency (Counts II and III). We disagree.

■  We undertake a two-step analysis to determine whether separate charges were properly tried at the same time. First, the government must demonstrate that the initial joinder of offenses was proper under Rule 8(a) of the Fed.R.Crim.P.[4]  *United States v. Gabay*, 923 F.2d 1536, 1539 (11th Cir.1991). Rule 8(a), however, is construed broadly in favor of initial joinder.  *United States v. Smalley*, 754 F.2d 944, 946 (11th Cir.1985). Proper joinder under Rule 8(a) is a matter of law reviewed *de novo*.  *Id.*  Next, we determine whether the district court abused its discretion by denying the motion to sever.  *Id.*  We will not reverse the denial of a severance motion absent a clear abuse of discretion resulting in compelling prejudice against which the district court could offer no protection.  *United States v. Jacoby*, 955 F.2d 1527, 1542 (11th Cir.1992); *United States v. Gardiner*, 955 F.2d 1492, 1496 (11th Cir.1992).

The charged offenses here were properly joined. Rule 8(a) allows joinder of offenses against a single defendant that "are of the same or similar character," even if such offenses do not arise out of the same series of acts or transactions.  *United States v. Kopituk*, 690 F.2d 1289, 1312 (11th Cir.1982), *cert. denied*, 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). Rule 8(a) is not limited to crimes of the "same" character but also covers those of "similar" character, which means "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness."  *United States v. Werner*, 620 F.2d 922, 926 (2d Cir.1980) (quoting Webster's New International Dictionary (2d ed.)). While the offenses charged in Count I are distinct in time from those alleged in Counts II and III, they are nonetheless similar. Each count relates to fraudulent activity designed to procure unwarranted federal crop relief. The evidence relating to Count I demonstrated that Walser knowingly prepared and back-dated a false document. She sent that document—the SCI–013 form—to

---

4.  Rule 8(a) of the Fed.R.Crim.P. states in relevant part that

Two or more offenses may be charged in the same indictment ... if the offenses charged, whether felonies or misdemeanors or both, are

of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Morrow explaining that the original had been attached to her 1986 acreage reports. It had not. She then subpoenaed Morrow as a defense witness at her first trial. She also subpoenaed documents from his file, including the falsified SCI–013 form. That form, which Walser had prepared and back-dated, was offered by Walser and admitted into evidence through the testimony of Morrow.

The evidence relating to Count II demonstrated that Walser needed documentary support for a phony disaster relief application. Unable to support her claim legitimately, Walser prepared and submitted falsified documents. Specifically, Walser caused an employee of Gold Kist to prepare a fictitious and back-dated invoice representing that Walser purchased certain seeds. Walser presented this false invoice to the ASCS to support her disaster application.

The evidence pertaining to Count III demonstrated that Walser again falsified a document to support a second phony application. Walser altered the document, a purchase invoice from The Wax Company, to reflect three untruths: (1) that her husband purchased the seeds, (2) that he ordered the seeds on March 17, 1989, and (3) that he purchased the seeds on March 18, 1989. Walser altered the original information with an opaquing fluid, then typed in the false information she wished the invoice to reflect. She also redrew certain lines to make the document appear as if it had not been tampered with. Walser presented a photocopy of this altered document to the ASCS committee to support her disaster relief claims.

The indictment outlines a tripartite sketch of Walser's efforts to obtain federal crop relief via falsified and back-dated documents and false testimony. Each count relates to the attempt—or to the coverup of those attempts—to obtain by fraud federal crop relief. The perjury charge in Count I flowed directly from Walser's efforts to deceive government agents and agencies to obtain unwarranted crop relief. That Walser's prevarications as to federal crop relief extended beyond the FCIC and into a court of law does not make the counts at issue here fun-

damentally dissimilar. Walser's deliberate falsehoods, and the necessity for covering them up, led to the perjury charge. Counts II and III also arise from Walser's attempts to defraud the government into providing unwarranted federal crop relief. *See United States v. Cartwright,* 632 F.2d 1290, 1293 (5th Cir.1980).[5] Walser's routine use of photocopied documents furthered her dishonest schemes. The falsified SCI–013 document sent to Morrow and later introduced into evidence was a photocopy, as were the false documents submitted to ASCS. By using photocopies instead of originals, Walser further obscured each document's true nature.

In sum, the charges alleged in the indictment are sufficiently related to Walser's schemes to mislead the government and obtain unwarranted crop relief. Accordingly, the offenses charged here are similar within the meaning of Rule 8(a). *See United States v. Whitworth,* 856 F.2d 1268 (9th Cir.1988), *cert. denied,* 489 U.S. 1084, 109 S.Ct. 1541, 103 L.Ed.2d 846 (1989); *United States v. Moeckly,* 769 F.2d 453, 465 (8th Cir.1985), *cert. denied,* 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986).

■■■ Walser argues that even if the joinder was proper, she nonetheless suffered compelling prejudice based on her contention that the jury could not separate the events surrounding Count I from those alleged in Counts II and III. To justify reversal "more than some prejudice must be shown; the appellant must demonstrate that he received an unfair trial and suffered compelling prejudice." *United States v. Harmas,* 974 F.2d 1262, 1269 (11th Cir.1992) (quoting *United States v. Berkowitz,* 662 F.2d 1127, 1132 (5th Cir. Unit B 1981)). "This is a heavy burden, and one which mere conclusory allegations cannot carry." *United States v. Hogan,* 986 F.2d 1364, 1375 (11th Cir.1993). The test for assessing compelling prejudice is whether under all the circumstances of a particular case it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own

---

**5.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

acts, statements, and conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict. *See United States v. Silien,* 825 F.2d 320, 323 (11th Cir.1987). If so, "though the task be difficult," there is no compelling prejudice. *United States v. Fernandez,* 892 F.2d 976, 990 (11th Cir.1989), *cert. dismissed,* 495 U.S. 944, 110 S.Ct. 2201, 109 L.Ed.2d 527 (1990). Moreover, if the possible prejudice may be cured by a cautionary instruction severance is not required. *Jacoby,* 955 F.2d at 1542.

We have examined the trial transcript closely to determine whether the events surrounding the perjury charge might be so inherently prejudicial in relation to the false representation charges as to prevent a fair trial. We conclude they are not. First, the evidence as to each count fully supported a finding of guilt. *See United States v. LaSpesa,* 956 F.2d 1027, 1032 (11th Cir.1992). Second, the jury heard at least twice that Walser had been acquitted of all charges in the 1986 trial. (R. II–24; R. IV–391). Moreover, the district court instructed the jury to consider each charge in the indictment separately and not to permit a verdict on one count to affect deliberations regarding another count. "Absent evidence to the contrary, we presume that the jury was able to follow the court's instructions and evaluate the evidence against each defendant independently." *United States v. Badia,* 827 F.2d 1458, 1466 (11th Cir.1987), *cert. denied,* 485 U.S. 937, 108 S.Ct. 1115, 99 L.Ed.2d 275 (1988). Last, the district court worked diligently to limit the use of evidence stemming from Walser's first trial as it pertained to Count I. We see no abuse of discretion resulting in compelling prejudice, and thus affirm the district court's denial of Walser's severance motions.

B. *Walser's Perjury and Aiding and Abetting Conviction*

■ Count I of the indictment charged that Walser

knowingly and willfully assisted and caused Richmond Morrow, a witness under oath ... to use and present a written document, knowing the same to contain a false material declaration; that is, VIRGINIA NELL WALSER caused to be intro-

duced into evidence, through the witness Morrow, a document which she knew to have been falsely made and back-dated, to-wit: Form SCI–013 entitled Southern Crop Insurance Agency, Inc., Statement of Facts, relating to 300 acres of soybeans, dated July 14, 1986; All in violation of Title 18, United States Code, Section 1623 and Section 2.

Section 1623 of Title 18 of the United States Code makes it a crime for any person under oath

in any proceeding before or ancillary to any court or grand jury of the United States [to] knowingly make[ ] any false material declaration or make[ ] or use[ ] any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration....

The government does not contend that Walser knowingly used false information under oath. Rather, it argues that Walser aided and abetted the commission of perjury, and thus, via operation of 18 U.S.C. § 2(b), is liable as a principal. Walser argues that her conviction under 18 U.S.C. § 1623 cannot be based upon application of the aiding and abetting provision of § 2(b) because she was never placed under oath in regard to the offenses alleged in Count I of the indictment. Thus, she claims, she had no legal capacity to commit the crime of perjury. Alternatively, she argues that the district court erred by denying her motions for a judgment of acquittal under Count I. As a legal question, we review Walser's conviction under §§ 1623 and 2 *de novo. See United States v. Power,* 881 F.2d 733, 738 (9th Cir.1989); *United States v. Smith,* 832 F.2d 1167, 1169 (9th Cir.1987). In reviewing the denial of a motion for a judgment of acquittal based on the sufficiency of the evidence, we view the evidence in the light most favorable to the Government and must affirm the conviction if any reasonable construction of the evidence allowed the jury to find the appellant guilty beyond a reasonable doubt. *United States v. McKinley,* 995 F.2d 1020, 1025 (11th Cir. 1993).

Section 2(b) of the aiding and abetting statute provides that

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal. 18 U.S.C. § 2(b).

"The standard test for determining guilt by aiding and abetting is to determine whether a substantive offense was committed by someone, whether there was an act by the defendant which contributed to and furthered the offense, and whether the defendant intended to aid its commission." *United States v. Jones,* 913 F.2d 1552, 1558 (11th Cir.1990); *United States v. Kelly,* 888 F.2d 732, 742 (11th Cir.1989). Title 18 U.S.C. § 2, however, does not establish a separate crime. *United States v. Pearson,* 667 F.2d 12, 13 (5th Cir.1982). Rather, it merely permits one who aids and abets the commission of a crime to be punished as a principal. *United States v. Sellers,* 871 F.2d 1019, 1022 (11th Cir.1989). An individual, therefore, may be indicted as a principal for the commission of a substantive crime and convicted upon evidence that he or she aided and abetted only. *United States v. Cook,* 745 F.2d 1311, 1315 (10th Cir.1984), *cert. denied,* 469 U.S. 1220, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985).

Further, an individual is criminally culpable for causing an intermediary to commit a criminal act even though the intermediary has no criminal intent and is innocent of the substantive crime. *Id.; Pereira v. United States,* 202 F.2d 830, 837 (5th Cir.1953), *aff'd,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954). In *United States v. Tobon–Builes,* 706 F.2d 1092 (11th Cir.1983), the defendant, Oscar de J. Tobon–Builes ("Tobon–Builes"), knowingly caused several banks not to file Currency Transaction Reports for transactions exceeding $10,000 as required by law. Tobon–Builes was indicted for the substantive offense of willfully concealing and causing to be concealed, by trick, scheme, or device, material facts within the jurisdiction of the Department of Treasury of the United States in violation of 18 U.S.C. § 1001. He was also charged with aiding and abetting in violation of § 2. A jury convicted him. On appeal, Tobon–Builes argued that his conviction was improper because, unlike a bank, he had no legal duty to report currency transac-

tions above $10,000. Thus, he argued, his legal incapacity to commit the crime of concealment—based on his lack of a duty to report currency transactions exceeding $10,000—freed him from culpability.

We affirmed his conviction, noting that courts have interpreted § 2(b) to find that a person

who is incapable of committing a substantive criminal offense if he acted alone may nevertheless be liable as a principal where he willfully causes the prohibited conduct ... to be committed by intermediaries ... who have the capacity to commit the substantive criminal offense but who lack the criminal intent to be guilty of that offense.

*Id.* at 1100.

We reject Walser's contention that § 2(b) may not be applied to perjury claims arising under § 1623. Section 2(b) applies generally to all federal criminal statutes and prohibits one from causing another to do any act that would be illegal if one did it personally. *United States v. Lennon,* 751 F.2d 737, 741 (5th Cir.), *cert. denied,* 471 U.S. 1100, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985). The purpose of § 2 is to permit a person operating from behind the scenes to be convicted even though that person is not expressly prohibited by the substantive statute from engaging in the acts made criminal by Congress. *Tobon–Builes,* 706 F.2d at 1100–01; *see also* S.Rep. No. 1020, 82nd Cong., 1st Sess. (1951), *reprinted in* 1951 U.S.Code Cong. & Admin.Service 2578, 2583 (noting that § 2(b) was "intended to clarify and make certain the intent to punish aiders and abettors regardless of the fact that they may be incapable of committing the specific violation which they are charged to have aided and abetted...."). As noted by the Sixth Circuit and cited by the *Tobon–Builes* court:

It is but to quote the hornbook to say that in every crime there must exist a union or joint operation of act, or failure to act, and intent. However, this is far from suggesting that the essential element of criminal intent must always reside in the person who does the forbidden act. Indeed, the latter may act without any criminal intent whatever, while the mens rea—"willful-

ness"—may reside in a person wholly incapable of committing the forbidden act. When such is the case, as at bar, the "joint operation of act and intent" prerequisite to commission of the crime is provided by the person who willfully causes the innocent actor to commit the illegal act. And in such a case, of course, only the person who willfully causes the forbidden act to be done is guilty of the crime.

*Id.* at 1101 (quoting *United States v. Lester*, 363 F.2d 68 (6th Cir.1966), *cert. denied*, 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967)).

Walser knew the document she sent to Morrow was false and back-dated. Indeed, the SCI–013 form she used had not even been printed or delivered by the date she purportedly wrote it. By falsifying and back-dating the SCI–013, then introducing it at trial through the innocent testimony of Morrow, Walser knowingly caused a fraudulent document to be entered into evidence during a court proceeding. Morrow lacked the criminal intent to commit perjury. As a witness under oath, he merely had the capacity to commit perjury. Section 2, however, operates to unite Morrow's capacity to commit perjury with Walser's intent that perjury be committed. Walser, as the crime's instigator and malefactor, adopted Morrow's capacity to commit perjury, including his status as a witness under oath. She is thus liable as a principal. "In causing an innocent intermediary to commit a criminal act, the causer adopts not only the intermediary's act but [also] his capacity [to commit the crime]." *United States v. Ruffin*, 613 F.2d 408, 416 (2d Cir.1979). We note further that Walser's contention that insufficient evidence existed to convict her of perjury, regardless of whether § 2(b) applies to § 1623, is meritless. For the foregoing reasons, we affirm Walser's perjury conviction.

## III. CONCLUSION

The charges alleged in the indictment were properly joined and did not result in compelling prejudice. Moreover, the district court properly applied the aiding and abetting provisions of 18 U.S.C. § 2(b) to the substantive charge of perjury under 18 U.S.C. § 1623. We therefore affirm Walser's convictions.

AFFIRMED.