[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-10658

_____

D.C. Docket No. 0:12-cr-60130-WJZ-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRYAN WHITEHEAD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 27, 2014)

Before HULL, BLACK and FARRIS,[*] Circuit Judges.

PER CURIAM:

Bryan Whitehead appeals his convictions and 471-month total sentence for

two counts of bank robbery, in violation of 18 U.S.C. § 2113(a), and two counts of

_____
[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by
designation.

brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). After careful review of the entire record, and with the benefit of oral argument, we affirm Whitehead's convictions, but vacate Whitehead's sentences and remand for resentencing.

## I.  FACTUAL BACKGROUND

This case involves Whitehead's commission of two bank robberies that occurred within thirty miles of each other, two years apart. The first robbery occurred on May 1, 2010, at a Bank of America in Delray Beach, Florida. The second robbery occurred on May 21, 2012 at a BB&T Bank in Plantation, Florida. We discuss the facts of both of these robberies below.

### A.    May 1, 2010 Bank of America Robbery

On the morning of May 1, 2010, Whitehead entered the Delray Beach Bank of America, which had just opened for business, and shouted, "This is a bank robbery. Everybody get down. This is not a joke. This is the real deal." Whitehead, a black male, had bare hands and wore a black mask to obscure his face, a safari hat over the mask, loose blue hospital scrubs, and a stethoscope around his neck. Whitehead was armed with a black semi-automatic gun.

Whitehead ordered the bank's employees not to push any alarms. Whitehead vaulted over the counter that separated the tellers from the bank's lobby. As he leapt over the counter, a black walkie-talkie fell from the pocket of

2

his pants onto the ground.  Whitehead did not retrieve the walkie- talkie off of the ground, and it remained there until law enforcement later discovered it.

Whitehead ordered the tellers to bring the money from their drawers to him, first removing any dye packs or tracking devices from the bills.[1]  While the tellers complied with Whitehead's order, a bank customer started to exit the bank. Whitehead pointed the gun at the customer, stated that he was "not playing," and racked the gun, letting those in the bank know the gun was loaded and ready to be fired.

Whitehead ordered, at gunpoint, the bank's assistant manager to take Whitehead to the bank's vault, which was located in a separate room of the bank. All of the bank employees went to the vault with Whitehead.  Once at the vault, the bank's assistant manager and another bank employee opened the vault, emptied it of money, and put the money, along with the money from the tellers' drawers, into a blue bag Whitehead had brought with him.  Whitehead fled the bank with approximately $30,000 in cash in his bag and was not apprehended by law enforcement.  Law enforcement was unable to determine the identity of the robber immediately following the robbery.

---

[1]At that time, Bank of America used dye packs, but not tracking devices.  A dye pack is placed into stacks of bills, and when taken from the bank, the dye pack explodes, causing brightly colored paint to cover the bills and, possibly, the robber.

3

Law enforcement seized the walkie-talkie that Whitehead left behind and swabbed the walkie-talkie and its batteries for DNA.  Two years later, after Whitehead's arrest for the May 21, 2012 robbery, which we describe below, law enforcement determined that the DNA on those swabs belonged to Whitehead.

**B.    May 21, 2012 BB&T Bank Robbery**

On the morning of May 21, 2012, Whitehead, wearing a mask to obscure his face, entered the Plantation BB&T Bank on Pine Island Road and ordered those in the bank to "get on the ground now."  Whitehead held a black semi-automatic gun and demanded that everyone put their hands in the air and refrain from pushing the silent alarm.  Whitehead's hands were bare and looked "ashy" and "cracked."

This bank, unlike the Delray Beach branch of Bank of America, had bullet resistance glass that separated the tellers from the lobby and customers.  Whitehead ordered a bank employee behind the glass to open the door that led to the tellers' stations and the bank's vault.  The employee opened the door because she feared what Whitehead would do to the customers and bank employees in the lobby if she did not comply.

Once behind the glass, Whitehead emptied the tellers' drawers of cash into a navy-blue- or black-colored laundry bag he carried with him.  The bag was "similar" to the blue bag Whitehead carried during the 2010 Bank of America robbery.  Whitehead then had a bank employee lead him to the bank's vault, which

4

was located in a separate room.  Whitehead pointed his gun at that employee while she opened up the bank's vault for Whitehead, and Whitehead then put the cash from the vault into his bag.  Whitehead then fled the bank with almost $14,000 in cash.

## C.    The May 21, 2012 Perimeter Stop

While the May 2012 bank robbery was in progress, a 911 operator received a call that a robbery was occurring at the Plantation BB&T Bank located on Pine Island Road.  At 9:29 AM, officers from the City of Plantation police department were dispatched to the scene.  At 9:31 AM, an officer arrived on the scene, but Whitehead was gone.  Witnesses informed law enforcement that Whitehead had crossed Pine Island Road on foot and disappeared behind hedges in front of an apartment complex.  An officer ordered that a perimeter be set up around the surrounding streets "to contain the fleeing suspect[]."

Law enforcement set up a perimeter around the bank, but there was a gap in the perimeter at the Chevron gas station on the northwest corner of Pine Island Road and West Broward Boulevard, about four blocks from BB&T Bank.  Drivers traveling south on Pine Island Road could turn into the gas station's entrance on Pine Island Road before reaching the perimeter checkpoint set up at the intersection of Pine Island Road and West Broward Boulevard.  These drivers

5

could then drive through the gas station's parking lot and exit onto West Broward Boulevard in the westbound direction, thereby avoiding the perimeter checkpoint.

At approximately 9:34 AM, Sergeant Douglas Powell arrived at the Chevron gas station to fill the gap in the perimeter. Sergeant Powell parked his car at the West Broward Boulevard exit of the gas station and activated his overhead lights so that drivers could not leave the gas station without stopping at his checkpoint.

Sergeant Powell asked each driver who went through the checkpoint whether anyone had attempted to get in his or her car and looked at each driver to see if he or she matched the description of the suspect set forth in a police broadcast. The broadcast described the suspect as a black male, armed with a black handgun, in his early twenties "with a gray shirt, tan pants with a black belt, black shoes carrying a black bag."[2]

The first few cars passed Sergeant Powell's checkpoint without incident. Next, a gray truck pulled up to the checkpoint, and the driver, later determined to be Whitehead, rolled down his window. Sergeant Powell observed a black male driver, who appeared to be in his early twenties, was "sweating profusely" and not wearing a seat belt.

Based on Sergeant Powell's observations and the fact that Whitehead was sweating profusely, despite it not being hot and no one else sweating to such an

---

[2]The bag was later determined to be blue.

6

extreme degree, Sergeant Powell decided to investigate Whitehead's identity and asked him for identification. Whitehead searched for his license in several compartments in his truck, but could not find it. Whitehead then lifted his hips upward in an apparent attempt to retrieve his license from the left rear pocket of his pants. When Whitehead lifted his hips, Sergeant Powell (1) saw that Whitehead wore red pajama bottoms over tan pants and a black belt and (2) saw an antenna sticking out of the left front pocket of Whitehead's tan pants. Based on what Sergeant Powell observed, he asked Whitehead to step out of the vehicle, and Whitehead complied. As Whitehead complied, Sergeant Powell saw that Whitehead wore no shoes and black sneakers lay on the floorboard of Whitehead's truck.

Given the similarities between the broadcast description and his observations, Sergeant Powell told Whitehead to place his hands behind his back. While handcuffing Whitehead, Sergeant Powell noticed that Whitehead's hands were covered with a substance later determined to be super glue. Because of the super glue on Whitehead's hands, his hands appeared to be cracked. Sergeant Powell believed that Whitehead used the super glue to conceal his fingerprints.

Sergeant Powell then did a pat-down of Whitehead and removed a radio from his pocket, which Sergeant Powell determined was actually a police scanner, set to the broadcast of the Plantation Police Department's dispatch

7

communications.  Sergeant Powell believed that Whitehead used the police scanner to monitor the police department's radio transmissions to know the department's whereabouts.

At 9:37 AM, Sergeant Powell advised other officers that he had likely detained the robber.  Sergeant Powell radioed Officer Albert Clark, who was at the scene of the robbery, to bring a witness to the gas station for a "show-up."  A show-up involves a single suspect of a crime being presented to a witness for identification.

### D.    May 21, 2012 Show-Up

After receiving Sergeant Powell's request, Officer Clark decided to have Violet Cepeda, the person best-positioned to observe Whitehead during the robbery, BB&T Bank's manager, identify the suspect.  During the robbery, Cepeda hid under the desk in her office and was as close as ten feet away from Whitehead. Cepeda clearly saw the side of Whitehead's face when, prior to exiting the bank, he lifted his mask all the way up, off of his face.  Cepeda continued to observe Whitehead after he exited the bank until he disappeared into hedges across Pine Island Road.  During the robbery, Cepeda called 911 and gave the operator a detailed description of Whitehead's clothing and build, and Cepeda later gave a more detailed description to law enforcement who arrived on the scene.

At approximately 9:41 AM, Officer Clark and Cepeda arrived at the Chevron gas station for the show-up. While Officer Clark's police vehicle was slowing to a stop in front of Whitehead, Cepeda looked through the front windshield, saw Whitehead from a distance of approximately ten feet away, and stated that Whitehead was the bank robber. At the time of the identification, Whitehead was in handcuffs and was surrounded by at least two uniformed police officers, in addition to plainclothes detectives. Cepeda made the identification without hesitation and was "a hundred percent positive" that Whitehead was the bank robber. Cepeda determined that Whitehead was the robber based on his profile, the shape of his face, his "pointy head," his lankiness, and his complexion. The police officers did not "parade" Whitehead in front of Cepeda, but did have him turn and face the vehicle in which Cepeda sat. No one else was presented to Cepeda as a possible suspect.

After the show-up, law enforcement searched the inside of Whitehead's truck and discovered, inter alia, a firearm loaded with three rounds, a total of $13,990 in U.S. currency (most was discovered in a blue bag, but some "loose currency" was found in the truck too), superglue, sandpaper, ear buds, a hat, and a mask.

After Whitehead was arrested, an officer obtained a DNA sample from Whitehead. The DNA sample was sent to the FBI's laboratory, which determined

9

that Whitehead's DNA matched the DNA found on the walkie-talkie and batteries left on the scene of the 2010 Bank of America robbery. The evidence showed that there was a one in 4.4 trillion chance that the DNA belonged to an African-American who was not Whitehead.

## II. PROCEDURAL HISTORY

### A. Superseding Indictment

In October 2012, a superseding indictment charged Whitehead with two counts of bank robbery (Counts 1 and 3) and two counts of brandishing a firearm during a robbery (Counts 2 and 4). Counts 1 and 2 concerned the 2012 BB&T Bank robbery, and Counts 3 and 4 concerned the 2010 Bank of America robbery.

### B. Motion to Suppress Proceedings

Also in October 2012, Whitehead filed a motion to suppress (1) evidence found following the May 21, 2012 search of his vehicle because the stop and search of his vehicle violated the Fourth Amendment and (2) Cepeda's identification of Whitehead at the gas station because that identification, made pursuant to a show-up procedure, violated his due process rights. As to his Fourth Amendment argument, Whitehead claimed that law enforcement lacked a reasonable suspicion that he had committed or was committing a crime. Whitehead did not specifically claim that the perimeter checkpoints constituted impermissible suspicionless stops, in violation of the Fourth Amendment.

10

The district court denied Whitehead's motion to suppress, finding that the stop and search of Whitehead's vehicle and Cepeda's identification of Whitehead as the perpetrator of the 2012 BB&T Bank robbery did not violate Whitehead's constitutional rights. The district court observed that Whitehead had "not specifically challenged that the perimeter itself was violative of the Fourth Amendment." Nevertheless, the district court stated "that under these circumstances, [the perimeter checkpoint did] not raise constitutional concerns."

## C.    Motion for Severance Proceedings

In November 2012, Whitehead filed a motion to sever of Counts 1 and 2 (concerning the 2012 BB&T Bank robbery) from Counts 3 and 4 (concerning the 2010 Bank of America robbery), pursuant to Rules 8(a) and 14 of the Federal Rules of Criminal Procedure. Whitehead claimed that Counts 1 and 2 were unrelated to Counts 3 and 4 and thus joinder was improper under Rule 8(a). Whitehead also claimed that he would be prejudiced if the district court did not grant his motion because (1) virtually all of the evidence that would be presented at trial stemmed from Counts 1 and 2 and (2) a jury could decide he was guilty of Counts 3 and 4 based on his criminal disposition established by the evidence of his commission of the crimes alleged in Counts 1 and 2. Thus, Whitehead argued that severance was proper under Rule 14.

11

The district court denied Whitehead's motion for severance and found (1) that the joinder of Counts 1 and 2 with Counts 3 and 4 was proper under Rule 8 because the two incidents involved similar robberies that shared several similarities and (2) Whitehead had not shown such compelling prejudice to warrant severance under Rule 14.

## D.    Trial

During Whitehead's four-day November 2012 trial, the government presented evidence against Whitehead in the form of witness testimony and surveillance videos from the relevant banks.  After the government rested, Whitehead moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure on Counts 3 and 4 (concerning the 2010 Bank of America robbery), and the district court denied the motion.  After Whitehead rested, he renewed that motion, and the district court again denied the motion.

The jury found Whitehead guilty of all four counts charged in the superseding indictment.

## E.    Sentencing

The presentence investigation report ("PSI") recommended base offense levels of 20 for Counts 1 and 3 (the bank robbery charges), pursuant to U.S.S.G.

§ 2B3.1(a).[3]  The PSI then added to each of those base offense levels: (1) a two-level increase for taking the property of a financial institution, pursuant to § 2B3.1(b)(1); (2) a one-level increase because the loss was more than $10,000, but not more than $50,000, pursuant to § 2B3.1(b)(7)(B); and (3) a four-level increase for abduction of a person to facilitate the commission of the offense, pursuant to § 2B3.1(b)(4)(A).  Counts 1 and 3 each had an adjusted offense level of 27.  Pursuant to the U.S.S.G. § 3D1.4 adjustment, Whitehead's total combined offense level for the two counts became 29.

Whitehead's advisory guidelines range on Counts 1 and 3 was 87 to 108 months' imprisonment.  Count 2 had a mandatory minimum consecutive term of seven years' imprisonment.  Count 4 had a mandatory minimum consecutive sentence of 25 years' imprisonment.

At sentencing on February 1, 2013, Whitehead objected to the four-level increase for abduction under § 2B3.1(b)(4)(A).  The district court overruled the objection and adopted the guidelines range of 87 to 108 months' imprisonment for Counts 1 and 3, as set forth in the PSI and the PSI Addendum.

The district court sentenced Whitehead to 87 months as to Counts 1 and 3, to be served concurrently to each other; 84 months as to Count 2, to run consecutively

---

[3]Because each bank robbery engendered a separate harm, Counts 1 and 3 were not subject to grouping under U.S.S.G. § 3D1.2(d).

to Counts 1 and 3; and 300 months as to Count 4, to run consecutively to the other counts. Whitehead had a total sentence of 471 months' imprisonment.

### III. MOTION TO SUPPRESS

A vehicle stop at a highway checkpoint is a seizure within the meaning of the Fourth Amendment, which requires that a seizure by the government be reasonable.[4] City of Indianapolis v. Edmond, 531 U.S. 32, 37, 40, 121 S. Ct. 447, 451, 453 (2000). A "seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." Id. at 37, 121 S. Ct. at 451.

Nevertheless, the Supreme Court has permitted suspicionless vehicle checkpoint seizures in certain circumstances. Id. at 37-38, 121 S. Ct. at 451-52; see Illinois v. Lidster, 540 U.S. 419, 423-26, 124 S. Ct. 885, 888-90 (2004) (upholding suspicionless checkpoint to locate witnesses to a hit-and-run); see also Mich. Dep't of State Police v. Sitz, 496 U.S. 444, 110 S. Ct. 2481 (1990) (upholding sobriety checkpoint); United States v. Martinez-Fuerte, 428 U.S. 543, 96 S. Ct. 3074 (1976) (upholding checkpoint near border to detect illegal aliens).

---

[4]As to motions to suppress evidence under the Fourth Amendment, this Court ordinarily reviews the district court's factual findings for clear error, and its application of the law to the facts de novo. United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000) (citation omitted). This Court, however, reviews arguments not raised in a defendant's motion to suppress for plain error. United States v. Young, 350 F.3d 1302, 1305 (11th Cir. 2003). In this case, the parties dispute the standard of review that applies. However, we need not resolve this dispute because we find no error, let alone plain error, in the district court's denial of Whitehead's motion to suppress.

Although we have not yet addressed in a published opinion the constitutionality of suspicionless vehicle checkpoint stops set up to apprehend a fleeing criminal suspect, we find the Supreme Court's decisions in City of Indianapolis v. Edmond and Illinois v. Lidster instructive.

In Edmond, the Supreme Court examined the constitutionality of a highway checkpoint program "whose primary purpose [was] the discovery and interdiction of illegal narcotics."  531 U.S. at 34, 121 S. Ct. at 450.   The Supreme Court determined that the suspicionless checkpoint violated the Fourth Amendment because the stops were "justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime."  Id. at 44, 121 S. Ct. at 455.  The Supreme Court declined "to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes."  Id. at 44, 121 S. Ct. at 455.

However, the Supreme Court acknowledged that there were "limited circumstances in which the usual rule [requiring individualized suspicion] does not apply."  Id. at 37, 121 S. Ct. at 451.  The Supreme Court stated that "the Fourth Amendment would almost certainly permit an appropriately tailored roadblock set up to thwart an imminent terrorist attack or catch a dangerous criminal who is likely to flee by way of a particular route."  Id. at 44, 121 S. Ct. at 455.  The

15

Supreme Court explained that the "exigencies created by these scenarios are far removed from the circumstances under which authorities might simply stop cars as a matter of course to see if there just happens to be a felon leaving the jurisdiction." Id. The Supreme Court declined to "limit the purposes that may justify a [suspicionless] checkpoint program to any rigid set of categories." Id.

In Lidster, the Supreme Court again addressed the constitutionality of highway checkpoint stops. The Supreme Court held that "a highway checkpoint where police stopped motorists to ask them for information about a recent hit-and-run accident" was not presumptively unconstitutional. 540 U.S. at 421, 426, 124 S. Ct. at 888, 890. The Supreme Court explained that, unlike the checkpoint program at issue in Edmond, an information-seeking checkpoint was not "primarily for general crime control purposes, i.e., to detect evidence of ordinary criminal wrongdoing." Id. at 423, 124 S. Ct. at 889-90 (quotation marks omitted). The Supreme Court clarified that Edmond was limited to those "stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." Id. at 424, 124 S. Ct. at 889 (quotation marks omitted).

Although the checkpoint at issue in Lidster was not presumptively unconstitutional, the Supreme Court determined that the Fourth Amendment would be violated unless the individual circumstances of the checkpoint were reasonable.

16

Id. at 426, 124 S. Ct. at 890.  The Lidster Court stated that, "in judging reasonableness," courts look to these three factors: "[1] the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty."  Id. at 427, 124 S. Ct. at 890 (quotation marks omitted).

In applying the three factors set forth in Lidster, the Supreme Court determined that the relevant public concern served by the information-seeking checkpoint was grave because police were investigating a crime that had resulted in a human death, police needed to obtain more information at that time, and "the stop's objective was to help find the perpetrator of a specific and known crime, not of unknown crimes of a general sort."  Id. at 427, 124 S. Ct. at 891.  Further, "[t]he stop advanced this grave public concern to a significant degree" because "[t]he police appropriately tailored their checkpoint stops to fit important criminal investigatory needs," as the stop took place a week after the hit-and-run accident, on the highway where the accident occurred, and at about the same time of night as the accident.  Id.  Finally, "the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect" because "each stop required only a brief wait in line," "[c]ontact with the police lasted only a few seconds," "[p]olice contact consisted simply of a request for information and the distribution of a flyer," "[p]olice stopped all vehicles systematically," and the police did not act "in

17

a discriminatory or otherwise unlawful manner while questioning motorists during stops." Id. at 427-28, 124 S. Ct. at 891.

Based on Edmond and Lidster, we must engage in a two-part inquiry. First, we must ensure that the perimeter checkpoints were not used for the "ordinary enterprise of investigating crimes." See Edmond, 531 U.S. at 44, 121 S. Ct. at 455 (quotation marks omitted). Then, we must decide whether the checkpoint stops were reasonable based on their individual circumstances. See Lidster, 540 U.S. at 426-28, 124 S. Ct. at 890-91.

Here, we have little difficultly concluding the perimeter checkpoints here were unlike the checkpoint program at issue in Edmond and were justified by exigencies created by the need to catch a known criminal who had just fled the scene of an armed robbery. The perimeter checkpoints here were not for general crime detection; rather, they were focused on one particular crime and one particular suspect.

The perpetrator, Whitehead, was an armed and dangerous criminal, who had—minutes before—successfully robbed BB&T Bank by pointing his semi-automatic firearm directly at bank employees to force them to give him the bank's money. Law enforcement knew that the robber had fled the area on foot, and there was a real risk that, to complete his escape, he would need a get-away vehicle and

18

that someone could be harmed in his attempt to gain access to that vehicle.[5] As the evidence showed, officers asked each driver stopped by the perimeter checkpoint whether anyone had attempted to get into his or her car.

Although the Supreme Court thus far has declined to limit the purposes that may justify a checkpoint program to any certain set of categories, see Edmond, 531 U.S. at 44, 121 S. Ct. at 455, we conclude that the perimeter checkpoint stops in this case were justified by the immediate need to find the perpetrator of the armed bank robbery, tailored to fit that need, and were not presumptively unconstitutional.

Further, after examining the three Lidster factors, we conclude that the individual circumstances of the perimeter checkpoint stops here were reasonable. See Lidster, 540 U.S. at 427, 124 S. Ct. at 890.  The relevant public concern was grave, in light of the need to find the perpetrator of an armed bank robbery.  The stops advanced this grave public concern to a significant degree, and the police appropriately tailored the perimeter checkpoint stops to the state's interest in capturing a specific armed and dangerous criminal.  The perimeter was set up in the area immediately surrounding the bank.  The officers at the perimeter checkpoints stopped the cars only to see if the driver matched the description of the

_____

[5]It is undisputed that Whitehead ran across Pine Island road and disappeared behind hedges in front of an apartment building.  We note that a police dog had tracked Whitehead's trail after he left the bank and his trail ended at an empty parking space behind the apartment building.  It does not appear, however, that law enforcement knew about where Whitehead's trail ended at the time law enforcement set up the perimeter.

19

robber and to ensure that no one had attempted to break into the drivers' cars. And, the perimeter's duration was short: it was set up within minutes of the robbery, and lasted only a few minutes, as Whitehead was found less than ten minutes after the robbery.

Finally, "the stops interfered only minimally with liberty of the sort the Fourth Amendment seeks to protect." See id. at 427, 124 S. Ct. at 891.  As in Lidster, each stop required only a brief wait in line and contact with the police lasted only a few seconds, enough time for Sergeant Powell to observe the driver and ask if anyone had attempted to enter the vehicle.  See id.  The police stopped all vehicles systematically.  And, Whitehead does not argue on appeal that the police acted in a discriminatory or otherwise unlawful manner while questioning motorists during the stops.  Accordingly, we conclude that the perimeter stops were reasonable under the Fourth Amendment, and the district court did not err in denying Whitehead's motion to suppress the evidence obtained as a result of a perimeter stop.

### III.  EXCLUSION OF IDENTIFICATION

"This Court employs a two-step analysis in assessing the constitutionality of a trial court's decision to admit an out-of-court identification."  United States v.

Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001).[6]   First, we must determine whether law enforcement used an identification procedure that is both suggestive and unnecessary.  See id.; Perry v. New Hampshire, 565 U.S. ___, ___, 132 S. Ct. 716, 724 (2012).  If we conclude that law enforcement used such a procedure, "we then must consider whether, under the totality of the circumstances, the identification was nonetheless reliable."  Diaz, 248 F.3d at 1102.  "Factors to be considered in determining whether the identification was reliable include: (1) opportunity to view; (2) degree of attention; (3) accuracy of the description; (4) level of certainty; and (5) length of time between the crime and the identification."  Id.

Whitehead argues that the show-up procedure, by which Cepeda identified Whitehead, was unnecessarily suggestive.  In support, he cites United States v. Brownlee, 454 F.3d 131, 138 (3d Cir. 2006), holding that a show-up procedure was unnecessarily suggestive because, inter alia, (1) the defendant was handcuffed and surrounded by police officers when the identification was made; (2) no suspect save the defendant was presented to any of the eyewitnesses; and (3) there was no reason why the eyewitnesses could not have been taken to the police station for a less suggestive line-up or photo array.  Whitehead also cites United States v. Hadley, 671 F.2d 1112, 1115 (8th Cir. 1982), stating that show-ups are "inherently

---

[6]As to motions to suppress out-of-court identifications under the Due Process Clause, this Court reviews a district court's factual findings for clear error and its application of the law to those facts de novo.  United States v. Smith, 459 F.3d 1276, 1293 (11th Cir. 2006).

21

suggestive and ordinarily cannot be condoned when a line-up procedure is readily available."

The government argues that a show-up procedure is not always unnecessarily suggestive, citing Johnson v. Dugger, 817 F.2d 726 (11th Cir. 1987), in which this Court explained that show-ups "allow identification before the suspect has altered his appearance and while the witness'[s] memory is fresh, and permit the quick release of innocent persons." Id. at 729.

Here, we need not address the first step of our due process analysis. Even assuming the show-up procedure was unnecessarily suggestive, we conclude, after examining the relevant factors concerning reliability under the second step of our analysis, that Cepeda's identification of Whitehead was highly reliable. See Diaz, 248 F.3d at 1102. Cepeda had an opportunity to view Whitehead during the robbery, as she testified that she observed him (1) in the lobby immediately after his entrance, (2) when he stopped, prior to exiting, to pull up his mask "all the way" off his face, and (3) after he had left the bank, without wearing his mask. And, Cepeda was attentive during the crime and recalled specific details concerning the robbery, including what Whitehead was wearing, the type of gun he was carrying, and other details about his physical appearance. Before the show-up, she relayed these details both to the 911 operator and, later, to Officer Clark.

22

Additionally, Cepeda was also accurate in her earlier description of Whitehead, as demonstrated by the surveillance tape and Whitehead's appearance at the time of his arrest. Further, Cepeda's recollection was fresh because the identification was made approximately ten minutes after Whitehead left the bank. In making the identification, she was approximately ten feet away from Whitehead and had an unobstructed view. She observed the shape of Whitehead's face and his physique to identify him. And, at the show up and later at trial, Cepeda was absolutely certain that Whitehead was the robber. Because Whitehead did not show that Cepeda's out-of-court identification was unreliable, we conclude that the admission of that identification did not violate Whitehead's due process rights.

Alternatively, we conclude that any error in admitting Cepeda's identification was harmless, in light of the overwhelming evidence against Whitehead as to Counts 1 and 2 of the indictment, concerning the 2012 BB&T Bank robbery.

## IV. SUFFICIENCY OF THE EVIDENCE

We review de novo the district court's denial of a Rule 29 motion. United States v. Hernandez, 743 F.3d 812, 814 (11th Cir. 2014). "In doing so, we view the evidence in the light most favorable to the government, drawing all reasonable inferences and credibility choices in favor of the jury's verdict." Id. "If a

reasonable jury could have found the defendant guilty beyond a reasonable doubt, then we will not overturn the jury's determination." Id.

Whitehead argues that the evidence was insufficient to support his convictions arising out of the 2010 Bank of America robbery (Counts 3 and 4).[7] Whitehead does not challenge the absence of any of the elements to support his 2010 bank robbery and brandishing a firearm convictions, but rather argues that a reasonable jury could not have found that he was the armed robber.  However, the evidence at trial, viewed in the light most favorable to the government, showed that the DNA profile developed from the swabs of the walkie-talkie (and its batteries) that the bank robber left behind matched Whitehead's DNA.  Furthermore, the evidence showed that there was a one in 4.4 trillion chance that Whitehead's DNA profile could match the DNA of another African-American.  Additionally, the blue bag that the robber carried during the Bank of America robbery was similar to the bag that Whitehead carried during the BB&T Bank robbery.  And, the Bank of America robbery, like the BB&T Bank robbery, occurred in the morning and was carried out by a single masked, hatted, and armed perpetrator.

Whitehead argues that the eyewitness testimony suggested that he was not the perpetrator of the 2010 Bank of America robbery, as he is five feet ten inches tall, and witnesses to the robbery testified that the robber was six feet five inches

---

[7]Whitehead does not argue that the evidence was insufficient to support his convictions arising out of the 2012 BB&T Bank robbery.

tall and "six foot plus." The witnesses' statements about the robber's height were estimates, however, and not actual determinations of his height. And, we note that the jury watched surveillance videos of the Bank of America robbery and had the opportunity to compare Whitehead's characteristics to those of the Bank of America robber. In light of the DNA evidence connecting Whitehead to the 2010 Bank of America robbery, and the similarities between that robber and robbery and the 2012 BB&T Bank robber and robbery, we conclude that the evidence was more than sufficient to support Whitehead's convictions on Counts 3 and 4.

## V.  SEVERANCE OF COUNTS 3 & 4

Rule 8(a) allows an indictment to charge a defendant "in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a).[8] "Rule 8(a) is construed broadly in favor of initial joinder, allowing joinder of offenses that 'are of the same or similar character,' even if such offenses do not arise at the same time or out of the same series of acts or transactions." See United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002). "[W]hen offenses are joined under

---

[8]This Court reviews de novo whether counts were properly joined under Rule 8(a) and then reviews whether the district court abused its discretion in denying a motion for severance under Rule 14. See United States v. Hersh, 297 F.3d 1233, 1241 (11th Cir. 2002).

Rule 8(a) by virtue of their 'same or similar character,' the offenses need only be similar in category, not in evidence." Id.

Rule 14 provides that a district court may order separate trials of counts where the joinder of the counts in an indictment appears to prejudice the defendant. Fed. R. Crim. P. 14(a). To justify reversal of the district court's decision denying severance under Rule 14, the defendant "must demonstrate that he received an unfair trial and suffered compelling prejudice." United States v. Walser, 3 F.3d 380, 386 (11th Cir. 1993) (quotation marks omitted). "This is a heavy burden, and one which mere conclusory allegations cannot carry." Id. (quotation marks omitted). Severance is not required when "the possible prejudice may be cured by a cautionary instruction." Id. at 387.

Here, we conclude that Counts 1 and 2 (concerning the 2012 BB&T Bank robbery) and Counts 3 and 4 (concerning the 2010 Bank of America robbery) were properly joined under Rule 8(a) because the counts are all of the same or similar character. See Fed. R. Crim. P. 8(a). Counts 1 and 2 were similar to Counts 3 and 4 both in terms of the types of crimes charged and the similarities in how the crimes were perpetrated.

Further, the district court's limiting instruction to the jury to evaluate the evidence on the two bank robberies independently cured any possible prejudice. Whitehead has failed to demonstrate that he "received an unfair trial and suffered

26

compelling prejudice," such that we must reverse the district court.  See Walser, 3 F.3d at 386 (quotation marks omitted).  We conclude that, in denying Whitehead's motion for severance, the district court did not err under Rule 8(a) and did not abuse its considerable discretion under Rule 14(a).

## VI.  SENTENCING

If the district court misapplied the Guidelines, remand is appropriate unless the sentence was not imposed "as a result of" the error.  18 U.S.C. § 3742(f); United States v. Bradley, 644 F.3d 1213, 1299-1300 (11th Cir. 2011).[9]

Under U.S.S.G. § 2B3.1(b)(4)(A), "[i]f any person was abducted to facilitate commission of the offense or to facilitate escape," the offense level is increased by four levels.  To be "'[a]bducted' means that a victim was forced to accompany an offender to a different location."  See U.S.S.G. § 1B1.1, cmt. n.1(A); (defining "abducted"); U.S.S.G. § 2B3.1, cmt. n.1.  Where a "person was physically restrained to facilitate commission of the offense or to facilitate escape," only a two-level increase applies, pursuant to U.S.S.G. § 2B3.1(b)(4)(B).

Since Whitehead was sentenced, this Court has clarified that a bank branch is treated as a single location, and thus, movement of victims within a bank branch to individual offices or rooms does not constitute movement to a different location for the purposes of the four-level abduction increase under § 2B3.1(b)(4)(A).

---

[9]We review the district court's application of the Sentencing Guidelines to the facts de novo.  United States v. Martikainen, 640 F.3d 1191, 1193 (11th Cir. 2011).

United States v. Whatley, 719 F.3d 1206, 1221-23 (11th Cir.), cert. denied, 134 S. Ct. 453 (2013).  Instead, when a defendant forces victims at gunpoint to move to different areas of a bank branch, the increase for physical restraint of victims under § 2B3.1(b)(4)(B) applies.  Id. at 1223.

The district court erred in applying a four-level increase for abduction under § 2B3.1(b)(4)(A) instead of a two-level increase for physical restraint under § 2B3.1(b)(4)(B).  Thus, Whitehead's advisory guidelines range for the robbery counts (Counts 1 and 3) was incorrectly calculated.  We therefore vacate Whitehead's total sentence and remand for resentencing.  Because the district court erred in calculating Whitehead's guidelines range, we do not reach his arguments concerning the substantive reasonableness of his sentences.

## VII.  CONCLUSION

For the foregoing reasons, we affirm Whitehead's convictions, vacate Whitehead's sentences, and remand for resentencing consistent with this opinion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**